IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

TC CURTIS and LORI CURTIS,　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　　　)　　TC-MD 160056N
　　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
LINCOLN COUNTY ASSESSOR,　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　　)　　**FINAL DECISION**[1]

Plaintiffs appeal the real market value of property identified as Account R47376 (subject property) for the 2015-16 tax year. Trial was held in the courtroom of the Oregon Tax Court on June 14, 2016, in Salem, Oregon. Plaintiff TC Curtis (Curtis) appeared and testified on behalf of Plaintiffs. William Bain (Bain), certified appraiser, testified by telephone on behalf of Plaintiffs. Joel Matz (Matz), Appraiser III, appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 27 and Defendant's Exhibits A through D were received without objection.

## I. STATEMENT OF FACTS

The subject property is a single-family residence located at 22 NW Oceania Drive in Waldport, Oregon. (Ptfs' Ex 1.) The subject property was built in 2005, has 2,274 square feet, and includes two bedrooms, two bathrooms, a fireplace, patio, radiant heating, and a two-car garage. (Ptfs' Ex 3 at 2.) The subject property is located at the southernmost end of the Bayshore Spit, located north of the Alsea River Bay along the Pacific Ocean. (*Id.*) The subject property is beachfront with a view of the Pacific Ocean. (*See id.* at 15; Ex 1.)

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered October 17, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

The subject property was listed for sale on April 16, 2015, with an asking price of $277,900. (Def's Ex A at 2.) The seller was the Bank of New York. (Def's Ex A at 5.) Curtis testified that the real estate agent listing the subject property contacted him immediately after the subject property was listed on the market. Plaintiffs offered the full listed price for the subject property on April 19, 2015, which the seller accepted. Plaintiffs' purchase of the subject property closed on June 9, 2015, for $277,900. (Def's Ex A at 2.) Curtis testified that he always offers the purchase price, as is custom when purchasing real estate. He further testified that the purchase of the subject property was an "REO"[2] sale and therefore an "arm's-length transaction." (*See* Ptfs' Ex 3 at 2.) Plaintiffs provided an appraisal by Bain, who appraised the subject property on behalf of Plaintiffs' lender. (*Id.* at 4.) Bain's appraisal listed the subject property as an REO sale. (*Id.*) Matz testified that the transaction was a foreclosure sale, and therefore not an "arm's-length transaction." Matz also submitted a countywide study showing that foreclosure sales typically sell for less than arm's-length transactions. (Def's Ex C at 2-6.)

Plaintiffs request a reduction in the real market value from $375,000 to $277,900. (*See* Compl at 1-2.) Curtis testified that the subject property is located in a specific area that has extreme sand drifts and requires constant maintenance, which reduces its real market value. (*See* Ptfs' Ex 3 at 2.) He testified that, in order to maintain the subject property, he purchased a John Deere Skid Steer loader for $26,500. (Ptfs' Ex 26 at 1.) Curtis testified that he has a construction company and is permitted to use the loader to mitigate the level of sand buildup on the subject property. He testified that he also uses the loader to clear the road for the subject property and his parents' property, located across the street. Curtis testified that he goes to the subject property at least every other weekend to clear the sand buildup. He testified that the only

/ / /

_____

[2] Real Estate Owned.

people who have permits to move sand on the spit are himself and the "Thistle Brothers," who charge $120 dollars an hour.

Curtis testified that the subject property cannot be compared to other properties, even properties up the street, because of the extreme sand conditions at the southernmost point of the spit. Curtis testified that the cut-off boundary for comparable houses is four houses to the north.

Bain appraised the subject property on May 19, 2015. (Ptfs' Ex 3 at 3.) Bain noted in the appraisal that "[b]oth market collapse and bad sand conditions in subject area caused sale at present level." (*Id.* at 2.) He further noted that "the subject is located in the southerly part of the PUD[3] which is plagued by the sand drift, but has shown resilience in spite of these problems." (*Id.*) Under adverse site conditions, Bain noted "[c]onstant sand migration from beach to lots in this area, piling up against dwellings in the area. Currently there are no legal solutions available." (*Id.*) Bain listed the effective age of the subject property at 20 years. (*Id.* at 2.)

Bain concluded that the subject property's real market value was $295,000. (Ptfs' Ex 3 at 3.) He relied upon four comparable sales in the Bayshore Division. (*Id.* at 3, 8.) Comparable #1 is located 0.44 miles from the subject property with an adjusted real market value of $290,700. (*Id*. at 3.) Comparable #1 is 35 years older than the subject property with an effective age of 25 years. (*Id.*) Comparable #2 is 0.25 miles away with an adjusted real market value of $334,400; it was built in 2005 with an effective age of 10 years. (*Id.*) Comparable #3 is located 0.59 miles away from subject property and has an adjusted real market value of $343,500. (*Id.*) Comparable #4 is 0.84 miles away from subject property and has an adjusted real market value of $370,450. (*Id.* at 8.)

/ / /

---

[3] Public Utility District.

Bain testified about the adjustments he made to the comparable sales in his appraisal. Bain noted under "location" that the subject property has "sand accumulation." (Ptfs' Ex 3 at 3.) For each of his comparable sales, Bain noted that they had "minor sand accumulation" and testified that he made a downward adjustment of $25,000 to each for the sand accumulation. Bain testified that this adjustment was the amount the market would value the cost to cure. He explained that, for the properties on the south spit, it could cost $500 to remove the sand or it could cost $32,000. Bain testified that the adjustment reflects the cost to remove the sand. On cross-examination, Matz asked how Bain determined the $25,000 adjustment amount. Bain testified the adjustment was based on his observations of the real market value of properties with sand accumulation compared to properties without the sand accumulation. Bain did not use a paired-sales analysis or similar method for the sand accumulation adjustment, but rather relied upon his expert judgment and opinion.

Matz testified that he conducted his own appraisal. (Def's Ex B at 2.) Matz also relied on the comparable sales method to determine the real market value of the subject property. (*Id*.) Comparable #1 is located seven houses north of the subject property and has an adjusted real market value of $336,377. (Def's Ex B at 2; 4.) Matz's Comparable #2 is the same as Bain's Comparable #2, which is 15 houses north of the subject property, 0.25 miles away. (*Id.*) Matz determined an adjusted real market value of $379,615. (*Id.*) Comparable #3 is 12 houses north of the subject property, less than 0.25 miles from the subject proeprty, and has an adjusted real market value of $369,220. (*Id.*)

Bain and Matz used different rating systems to describe condition, quality, and class. Matz testified that he used the quality class system provided by the Department of Revenue. Bain used the Uniform Appraisal Dataset to determine adjustments for condition of the property

and quality of the construction. (Ptfs' Ex 3 at 9.) Bain listed the subject property's condition as C4, which is defined as "improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate." (*Id.* at 9.) A C3 is better maintained than a C4, and a C2 requires little to no deferred maintenance. (*Id.*) Bain listed his comparable sales as either C2 or C3. (*Id.* at 3; 8.) Bain made a downward adjustment ranging from $1,500 to $4,000 because his comparable sales were all superior in condition to the subject property. (*Id.*)

Plaintiffs also submitted evidence of bare land sales. (Ptf's Ex 12; 13.) Curtis argued that his land value is too high compared to the recent bare land sales near the subject property. Matz testified that bare land sales are not comparable to the subject property due to the lack of onsite developments. He testified that bare lots usually require certain improvements to prepare them for the construction of a house.

The subject property's 2015-16 tax roll real market value was $420,760, and the board of property tax appeals reduced that real market value to $375,000. (Compl at 2.) The subject property's 2015-16 maximum assessed value was $391,570. (*Id.*) Plaintiffs rely on their purchase price of the subject property, $277,900, and the appraisal by Bain, which concluded the subject property's real market value was $295,000. (Ptfs' Ex 3 at 3.) At trial, Matz requested that the court find a real market value of $340,230 based on his appraisal. (Def's Ex B at 2.)[4]

///

///

_____

[4] The value conclusion of $340,230 is cut off on the exhibit page. During trial, Matz testified that he concluded a real market value of $340,230.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2015-16 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[5]

The assessment date for the 2015-16 tax year was January 1, 2015. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a).[6] Although all three approaches must be considered, not all three approaches may be applicable in a given case. *Id.* The value of the property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.,* 16 OTR 9, 11 (2001) (citation omitted).

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his

---

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

[6] The Department of Revenue has recently renumbered the Oregon Administrative Rules (OAR). The new citation for the rule is 150-308-0204(2)(a).

burden of proof." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (citations omitted). Competent evidence includes "testimony from licensed professionals such as appraisers, real estate agents [,] and licensed brokers." *Hausler v. Multnomah County Assessor*, TC-MD 110509D, WL 5560673 at *4 (Nov 15, 2011). The court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Plaintiffs argue that their purchase price of $277,900 reflects the real market value of the subject property, due to the market crash of 2008 and the extreme sand conditions. Plaintiffs presented evidence and testimony of sand conditions, an appraisal report and testimony from the appraiser Bain, the cost of a John Deere Skid Steer loader, and bare land sales. Defendant argues that the subject property's real market value is $340,230 based on comparable sales of properties in the Bayshore South Division. Defendant presented evidence of adjusted comparable sales and a study showing that foreclosure sales typically sell for less than arm's-length sales.

A.      *Purchase Price*

Plaintiffs have asked the court to conclude that their purchase price of $277,900 reflects the real market value of the subject property. The sale price of a recent, voluntary, arm's-length sale of property between a willing buyer and seller, both of whom are knowledgeable, although not conclusive, is very persuasive of market value. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973); *see also Kryl v. Lane County Assessor*, TC–MD No 100192B, WL 1197444 at *2 (Mar 30, 2011).

/ / /

Plaintiffs' sale, which closed five months after the assessment date, was recent. The question is whether the sale of the subject property was a "voluntary, arms-length" transaction. The Bank of New York owned the subject property at the time of the sale. "There are many practical reasons why the sale of a property following a foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value." *Kryl*, WL 1197444 at *2. For example, "the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth." *Id*. "This court has been reluctant to consider 'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor*, TC-MD 110361C, WL 1426847 at *4 (Apr 25, 2012) (citations omitted). A foreclosure sale does not represent a voluntary transaction between a buyer and seller. The seller of the property might be compelled to sell the property at a lower value in order to settle the debt of the property. Therefore, a foreclosure sale is typically not considered a voluntary, arm's-length transaction under ORS 308.205.

Plaintiffs argue that their purchase of the subject property was its real market value due to the 2008 market collapse and extreme sand accumulation. Curtis testified that the subject property was worth "around $500,000" before the market collapse and its value dropped after the economic collapse. Plaintiffs presented an appraisal that described the sale of the subject property as an REO bank sale and concluded the subject property's real market value was $295,000, which is more than their purchase price. Plaintiffs argued that the appraisal took place after three weeks of cleaning the subject property and it does not represent the extreme sand conditions. However, Plaintiffs did not provide any objective evidence to explain the $17,100 difference between their purchase price of $277,900 and the appraisal value of $295,000.

The court is not persuaded that Plaintiffs' purchase price reflects the real market value of the subject property because it was a foreclosure sale and Plaintiffs' lender's appraisal concluded a real market value greater than the purchase price. Furthermore, the subject property was not exposed to the market to determine if the foreclosure sale represented the real market value. If subject property had been exposed to the market and a series of offers and negotiations had taken place, the purchase price might have been indicative of the real market value, because it would represent a voluntary sale on behalf of the seller. Instead, the subject property was pending sale three days after it was listed on the market. Plaintiffs have failed to meet their burden of proof that their purchase price reflected the subject property's real market value.

B.       *Comparable Sales Approach*

Both parties offered evidence under the comparable sales approach. The real market value conclusions of Bain and Matz are each less than the subject property's 2015-16 real market value, indicating that value is in error. "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions." OAR 150-308.205-(A)(2)(c).[7] "The court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson*, WL 21263620 at *3.

Based on the sales comparison approach, Bain determined a 2015-16 real market value of $295,000, whereas Matz concluded $340,230. As noted earlier, both Bain and Matz used comparable #2 for their comparable sales analysis. However, Bain determined comparable #2 had a real market value of $334,400, whereas Matz determined the same property had a real

---

[7] OAR 150-308-0204(2)(c).

market value of $379,615. Bain made downward adjustments of $25,000 for sand accumulation. Matz testified that he did not make a sand adjustment because the comparable sales he used were so close to the subject property that they were also subject to sand accumulation. For the reasons discussed below, the court finds Matz's analysis and value conclusion more persuasive.

First, Matz's comparable sales are closer to the subject property than the comparable sales presented in Bain's appraisal. Plaintiffs argued that none of the comparable sales presented were truly comparable because of the location of the subject property at the southernmost end of the spit. Curtis testified that the extreme sand conditions limit the comparable market to four houses north of the subject property.

Matz's comparable sales #1, #2, and #3 are less than .25 miles away from the subject property. Comparable #1 is seven houses north of the subject property, comparable #3 is 12 houses north of the subject property, and comparable #2 is 15 houses north of the subject property. Due to the conditions of the area where the subject property is located, comparable sales that are closest to it represent the best comparisons. Matz's three comparable sales ranged from $336,377, which is the closest property, to $379,615, which is the farthest property. Because Matz's comparable sales are closer to the subject property, the court finds they more accurately reflect the real market value of the subject property. In contrast, Bain's comparable sales were farther north, reaching as far as .84 miles north.

Second, Bain adjusted each of his comparable sales for sand accumulation, but the court finds that no additional sand adjustment is supported by evidence. Matz did not include sand adjustments in his appraisal because each of the comparable sales was less than .25 miles north of the property.

/ / /

Plaintiffs provided evidence in support of their assertion that the subject property's real market value is negatively impacted by extreme sand conditions. Plaintiffs submitted pictures of the sand accumulation on the subject property. (Ptfs' Exs 16-24.) Curtis testified the pictures reflected the subject property at its clearest and that the sand accumulation is actually worse than depicted in the pictures. Those pictures and Curtis' testimony are persuasive that sand conditions negatively impact the subject property. However, Plaintiffs did not provide any persuasive evidence regarding the cost of sand-related maintenance. Curtis testified regarding general estimates taken from conversations with his neighbors and his general knowledge of the price charged by the "Thistle Brothers" for sand removal. None of the estimates were included in evidence, except the cost of the John Deere Skid Steer loader for $26,500. Curtis' cost estimates of $5,000 to $20,000 do not clearly identify what costs are associated with what service.

Without credible evidence of the sand removal maintenance costs for the subject property as compared with the comparable sales, the court cannot determine whether an adjustment to real market value is warranted based on the subject property's sand conditions. If Plaintiffs had submitted a quote that showed the cost of cleaning up the sand for the year or the cost of sand removal maintenance for the comparable sales, the court might have been able to determine whether an adjustment for sand removal maintenance is supported in this case. However, testimony describing estimates is not enough to overcome the burden of proof in this case.

Much of the difference in the value opinions of the two appraisers is due to Bain's $25,000 downward adjustments for sand accumulation. The court finds Matz's comparable sales are located close enough to the subject property that they also reflect sand accumulation issues. Furthermore, Bain testified that the downward adjustment of $25,000 is not indicative of the cost

to cure for every property, but is a general adjustment. Bain testified that the cost to cure could range from $500 to $32,000. Because Matz used comparable sales that suffer from sand accumulation similar to the subject property and because Bain's testimony did not persuade the court that all of his comparable sales needed such a large sand adjustment, the court relies on Matz's appraisal.

Plaintiffs also presented sales of bare land near the subject property to show that their land value is too high. Matz questioned the relevance of comparing bare land to developed lots. He testified that bare land sales are not comparable due to the lack of onsite developments. Matz explained that it could cost approximately $20,000 to prepare the bare land for construction. The court agrees with Matz. Bare land sales with no adjustment for onsite developments are not helpful to determine the subject property's land real market value.

For those reasons, the court is persuaded that the 2015-16 real market value of the subject property was $340,230, as determined by Matz.

## III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2015-16 real market value of the subject property was $340,230. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that the 2015-16 real market value of property identified as Account R47376 was $340,230.

Dated this ___ day of November 2016.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on November 7, 2016.*